GROVES, APPELLEE, *v.* PHILLIPS PETROLEUM CO., APPELLANT,
ET AL.
GROVES, APPELLEE, *v.* AMERICAN RADIATOR & STANDARD
SANITARY CORP., APPELLANT, ET AL.

[Cite as Groves v. Phillips Petroleum Co. (1969),
22 Ohio App. 2d 25.]

(Nos. 6194 and 6195—Decided July 23, 1969.)

*Mr. Raymond J. McGowan* and *Mr. William B. Hewitt*, for appellee.

*Messrs. Slabaugh, Walker, Pflueger, Roderick & Myers* and *Mr. William J. Zeman*, for appellant Phillips Petroleum Company.

*Messrs. Buckingham, Doolittle & Burroughs* and *Mr. Charles F. Scanlon*, for appellant American Radiator & Standard Sanitary Corporation.

HUNSICKER, P. J. This is an appeal on questions of law from a judgment in favor of Donald G. Groves against American Radiator & Standard Sanitary Corporation (herein called Amstan), and Phillips Petroleum Company (herein called Phillips). Two cases in this court were argued together and so submitted to this court.

Donald G. Groves was employed as a "B" cable splicer by Ohio Edison Company. On July 2, 1965, he was engaged at the Grove Street Substation, located in Cuyahoga Falls, Ohio, in repairing a broken cable. He was required to work in a concrete underground vault, through which the cable ran. In order to properly splice or repair the cable, heat was used, produced by means of a cylinder or tank of propane gas. This propane gas was purchased by Ohio Edison Company from Amstan. The cylinders or tanks were not sold or purchased in this process, but were the property of Insto-Gas Company of Detroit, Michigan, who are not parties to this action. Insto-Gas Company had a contract with Phillips to service and fill these propane gas containers, and to repair them if the occasion arose. Amstan acted as the distributor of the filled container, from whom the ultimate consumer, like Ohio Edison Company, received the propane gas to be used by its employees.

While Mr. Groves was engaged in cable repair on July 2, 1965, he left the underground vault for a short time, turning off the gas container at a hose nozzle which was attached to the outlet of the container that was controlled by a shut-off valve. This valve was seated on a diaphragm or "O" ring, which, when the valve was closed, acted to prevent the escape of gas, or, if open when the hose and

nozzle valve attached thereto was to be used, permitted gas to move to the burner end of the hose. When the hose nozzle valve was closed, gas could not escape, even though the cylinder or container valve was open.

When Mr. Groves left the underground vault, he turned off the hose nozzle valve, but not the container valve; a practice used by splicers when they were absent for less than one hour. Upon his return to the vault, and before trying to light the hose nozzle, he attempted to light a cigaret with his cigaret lighter, when an explosion occurred, severely injuring him.

Mr. Groves was off work for several months, and was in a hospital and at home; he lost wages; suffered great pain while in the hospital and, while convalescing, required extensive grafting of skin, and the amputation of a portion of one finger. He has scars on his face and hands; some restriction in gripping articles; sensitivity to heat and cold on the new skin areas; and a prognosis of future pain and skin shrinking in the areas where he was burned.

Mr. Groves is again employed by his former employer, Ohio Edison Company, as a cable splicer. His wages per hour are now higher than those he received prior to his injury.

The action against Amstan and Phillips resulted in a jury verdict for Mr. Groves in the amount of $200,000. It is the judgment entered on that verdict that we review in this memorandum.

Amstan, in its work of distributing, from its local warehouse, the filled gas cylinders or tanks, usually made no effort to discover whether there was a leakage of gas. It left that task to Phillips, whose contract with the tank owner required that company to service the tanks, which weighed, when filled with propane gas, 43 pounds. The tank, empty, weighed 18 pounds, and was about 18 inches tall and 22 to 24 inches in diameter. Amstan had no extra valves, diaphragms, or "O" rings, and it did not have the special wrenches to dismantle the valve and valve stem. These spare parts and tools were kept by Phillips. It was possible to use conventional tools to do this work, and, if

Amstan had requested them, Insto-Gas would have supplied tools and spare valves and other parts.

Various bulletins put out by Insto-Gas Company, the owner of the tank, called for the inspection of the tank, and the return of worn valves and parts. No valves or discarded diaphragms had been returned to Insto-Gas Company for several years prior to the accident. No tank was discarded, or a valve dismantled and replaced, unless evidence of escaping gas was apparent from a soap test given each tank by Phillips prior to its return to Amstan. Amstan did not examine the tanks, unless, by odor or sound of escaping gas, it discovered a defective tank. It is apparent that valves were dismantled very infrequently to inspect the diaphragms or "O" rings, which, if in a worn or deteriorated state, would cause an escape of propane gas.

Testimony was introduced by counsel for Mr. Groves, the plaintiff, to show that the diaphragm or "O" ring on the tank of propane gas used by Mr. Groves, which was obtained from Amstan and filled by Phillips, was seriously deteriorated, worn and ruptured. The jury found, by way of special interrogatories, that the defect, which permitted the escape of propane gas, was a latent defect. It is from such evidence that the claim of negligence, and the claim of breach of implied warranty (the two causes of action in the petition of Mr. Groves), were based.

Phillips assigns as error that the Court of Common Pleas erred in overruling its motions for a directed verdict, and in overruling its motion for a new trial. Phillips says that the questions presented are:

"1. Does the manufacturer of liquefied propane gas, who has a contract to fill cylinders that it neither owns, bails, or leases, impliedly warrant that said cylinders are fit for use when leased by another to its customers?

"2. What is the scope of the duty owed by the manufacturer of said propane gas as to the condition of the cylinders it fills, but does not own, bail, or lease? If such a duty existed to the plaintiff in this case, was there any evidence presented to support the conclusion that said duty was breached?

"3. Assuming a warranty or duty as to the condition of an unowned cylinder, can a gas supplier be held liable without evidence that the defect in the cylinder existed when the cylinder left the supplier's possession?

"4. Is the verdict so excessive as to indicate that it was given under the influence of passion and prejudice?

"5. Was the plaintiff contributorily negligent as a matter of law, and should the court have submitted appellant's special finding on this question?"

Amstan says that:

"1. The lower court erred in overruling Amstan's motion for directed verdict as to the first cause of action made at the conclusion of the appellee's case and renewed at the conclusion of the entire case.

"2. The lower court erred in refusing to charge the jury in a requested special instruction that Amstan did not have a duty to inspect the cylinder in question for the purpose of discovering latent defects in that cylinder.

"3. When the jury specially found that the cylinder in question contained a latent defect when delivered by Phillips Petroleum Company to Amstan, the lower court erred in refusing to grant Amstan's motion for judgment against the verdict as to the first cause of action.

"4. The lower court erred in refusing to grant Amstan's motion for judgment against the verdict as to the first cause of action when the jury's special finding as to the nature of Amstan's negligence did not constitute actionable negligence as a matter of law.

"5. The lower court abused its discretion in failing to permit Amstan to amend its answer so as to conform to the evidence by including an allegation that the plaintiff was contributorily negligent.

"6. The lower court erred in refusing to require the jury to specially find upon the plaintiff's negligence.

"7. The lower court erred in charging the jury that in distributing a cylinder which it did not design, did not manufacture, did not own, and was not selling, Amstan was strictly liable for any defects in that cylinder.

"8. The lower court erred in failing to grant a mis-

trial because of improper final argument by counsel for plaintiff.

"9. The lower court erred in refusing to grant a new trial because of the excessiveness of the verdict."

We shall direct our discussion herein to the responsibility of the defendants (appellants here), who placed in the channels of commerce a defective container of a highly inflammable and dangerous substance, knowing that it would be used by workmen for various services where such inflammable gas was useful.

Phillip says that: it did not own the container; it conducted its soap test, thereby indicating care in the handling of the product; inspection of the valve diaphragm would be difficult, time consuming, and unnecessary.

Amstan says that: it did not own, design, manufacture or sell the tank, but acted only as a conduit through which the tank passed from Phillips to Ohio Edison Company; as such conduit, it was not liable for the result of any defect in the tank which it delivered to Ohio Edison Company for use by its employees.

Counsel for Amstan, in their brief, say:

"It is essential, therefore, in the interest of settling as quickly and economically as possible the various responsibilities of all interested parties that the court *now consider* and pass upon *each assignment of error* in these appeals." (Italics theirs.)

Section 2505.21, Revised Code, requires that all errors assigned and briefed shall be passed upon by the court. That section does not require a discussion of each assigned error. Only in case of a reversal must a reason be set forth in the judgment entry.

The jury found both Phillips and Amstan to have been negligent in delivering a defective, dangerous article to another for use by its employees. There was a general verdict and, hence, it must be assumed that the jury also determined that the parties breached the implied warranty alleged in the second cause of action. The jury specifically found that, when Phillips delivered the filled tank of propane gas to Amstan, it was then defective and such defect

was a latent defect. Was each of such handlers of this commercial product required to inspect the product so as to discover this latent defect?

Amstan insists that it had no duty to inspect for latent defects. To support such view, it cites a case from this court, *Cundiff* v. *F. W. Woolworth Co.*, 29 Ohio Law Abs. 123, and cases from many other jurisdictions, as well as text authority. See: 6 A. L. R. 3d 16 *et seq.* Cited also is 2 Restatement of the Law of Torts 2d 345, Section 402. This chattel, however, was not one for which, in the ordinary sense, inspection is not necessary or required. The seller-bailor, Amstan, was not purveying packaged face cream, or aerosol-deodorant in sealed containers. Amstan was a warehouse distributor of gas-filled tanks that were returned empty, sent for refilling to Phillips, returned to Amstan, and again and again put into the channels of commerce. The evidence here is that little or no effort was made by Amstan to check these gas-filled containers; its object was to keep the inventory moving to the consumer. In this respect, there is a vast difference between a one-time seller to a user of a sealed package with a latent defect, and the repeated bailment of the same filled container to a user.

Amstan was not a retailer in the ordinary sense, but a warehouseman-supplier of a product. Amstan knew or, in the ordinary course of business, should have known that the sealed container it was putting out and into the hands of a user, such as Mr. Groves, had been used many, many times. If it did not know how many times this specific container here involved was used and reused, then it must be held accountable for placing in commerce a defective article. Amstan knew that turning the valve repeatedly would destroy the diaphragm but, apparently, it preferred to avoid using that knowledge. Amstan cannot, under the facts here, point the finger of scorn at Phillips only. Amstan was an integral part of the process of getting propane gas into commercial channels; using the same containers again, and again, and again. The responsibility of Amstan we base on the failure of Amstan to use care commensurate

with the dangerous product involved, as well as the breach of implied warranty of fitness for use by employees such as Mr. Groves.

We think it equally clear that, when Amstan delivered the cylinder or container of propane gas to Ohio Edison Company, there attached to that delivery a warranty that the cylinder was in a condition that it could be used by the employees of Ohio Edison Company without a risk of harm. As to Amstan, the rule of strict liability applies in this case.

In the view we take of the position of Amstan in the matter set out before us, the rules found in the cases of *Sicard* v. *Kremer*, 133 Ohio St. 291, and *Lonzrick* v. *Republic Steel Corp.*, 6 Ohio St. 2d 227, determine this case.

What we have said with reference to Amstan applies with as great a degree to Phillips, who supplied the propane gas. Phillips was the one who should have known, equally with Amstan, the length of time the cylinder had been in service, for there was a date on each cylinder indicating the time when such cylinder went into service. Phillips had valves, diaphragms, "O" rings, and spare parts for the cylinder. It had bulletins calling on it to do certain checking of equipment, together with tools to disassemble the cylinder to look at the diaphragm. The evidence shows that Phillips had not returned to Insto-Gas any worn or defective valves, or asked for replacement parts, for such a long period that Insto-Gas called that fact to Phillips' attention a short time before this cylinder exploded.

Phillips cannot escape liability herein on the claim that it was not negligent in the premises, or that it did not breach the implied warranty of fitness.

The trial judge, under the above conclusions reached by us, did not commit prejudicial error in refusing to submit certain interrogatories to the jury. For the reasons expressed herein, the trial court was correct in refusing to grant, for the defendants (appellants here), a motion for judgment against the verdict.

There was no allegation in either answer that Mr. Groves had failed to exercise care in protecting himself

from injury, or to use care to avoid injury to himself. At first blush, it would appear that one who goes into a confined area, like this vault, where there is a container of a highly explosive gas, and lights a match or cigaret lighter, is, to say the least, foolish. It must be remembered, however, that customarily these cylinders were taken into such a confined area and, in the course of work, the fuel must be lit.

For these reasons, it was a jury question as to whether Mr. Groves failed to exercise care for his own safety, or was at fault in failing to smell the propane gas that obviously leaked out into the confined area. The court instructed on the subject of contributory negligence; and no error was committed in failing to permit an amendment of the answers, or in refusing to submit special findings of fact with reference to the conduct of Mr. Groves.

Objection was entered, by counsel for Amstan, to the oral argument of counsel for Mr. Groves. That objection concerned the use of the word "profit" in the course of his argument. That word was used once in opening argument, and six times in the closing argument. We consider such conduct wrong and wish to express our condemnation of its indiscriminate use where the facts of a case do not call for its use. We, however, have read and reread the context in which it was used, and have come to the conclusion that, in this case, it did not result in error prejudicial to the rights of the appellants. That is not to say that its future use will result in the same treatment.

One of the most difficult decisions for a judge to make concerns a claim that the verdict is excessive, it being the product of passion and prejudice. How does one measure pain? How does one measure embarrassment because of a disfigured face? If there is evidence of loss of wages; of medical, hospital, and other expenses; it does not become a difficult problem to make an addition and arrive at a sum. The other features of a verdict are not concrete and, hence, must be left to the judgment of a jury; unless that jury verdict shocks the conscious of the court, the result reached by that body must be approved.

Mr. Groves is presently gainfully employed at an

hourly wage greater than that received at the time of his injury. He is still a "B" cable splicer, and the only reason he has not been advanced seems to be that no opening for an "A" cable splicer has developed at the Ohio Edison Company. Will that company keep him when, as time goes on, he becomes less efficient because he does not grip his tools effectively, or because the grafted skin begins to pain and his efficiency as an employee decreases? Those questions have the vice of conjecture but, perhaps, these things, too, went through the minds of the jurors. If we take the wages per hour that Mr. Groves received on the day of trial, and figure a forty-hour week for fifty-two weeks, he would receive a pay of $5884.80 a year. Assuming that he receives some overtime, he will make in the neighborhood of $6000 to $8000 per year. The jury award invested in United States government notes, or in triple "A" corporate bonds, will produce as much, or more, than either of the above figures.

Now, this court understands that out of the award of the jury there are expenses incident to the injury, of expert testimony, and, of course, lawyers' fees; so that $200,000 could easily be more nearly $100,000 to $120,000; and, thus, the award becomes more realistic.

We cannot, upon analysis, say that the verdict was the result of passion and prejudice, and, therefore, we reject that claim on the part of the appellants.

We have examined all of the claims of error set out by Amstan, and all of the claims of error and questions presented by Phillips, and find none prejudicial to the substantial rights of these appellants. The judgment must be affirmed.

*Judgment affirmed.*

Doyle and Brenneman, JJ., concur.